UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                      Case No. 10-CR-039

CHRISTOPHER A. JOHNS,

    Defendant.

**THE UNITED STATES OF AMERICA'S
SUPPLEMENTAL BRIEF REGARDING LOSS**

The United States of America, by and through United States Attorney James L. Santelle and Assistant United States Attorney Gordon P. Giampietro, respectfully submits this supplemental brief regarding loss. Specifically, during the July 12, 2011 sentencing hearing, this Court indicated that it was prepared to grant defendant Christopher A. Johns's ("Johns") objection to the specific offense characteristic loss calculation in paragraph 29 of the Presentence Investigation Report ("PSR"). *See* Sentencing Minutes, page 2 (Doc. No. 93). This Court granted the United States's request that the parties be permitted to submit supplemental briefs on the loss issue. Depending on how the issue is resolved, the 10-level increase in ¶ 29 of the PSR, as well as the restitution award in ¶ 94, may vary

-1-

dramatically. For the reasons set forth below, the United States respectfully submits that the loss calculation in ¶ 29 is correct.

ARGUMENT

The essence of Johns's argument with respect to the Ten Hoves and Michelle Coleman is set forth on pages 8-12 of his Sentencing Memorandum. Doc. No. 88. In short, he argues that these victims suffered no harm – and therefore no loss and restitution should be calculated and awarded – because the purchase prices paid by defendant Allen D. Banks ("Banks") did not represent the true market price, but were based instead on a "fraudulently inflated value." Doc. No. 88, page 10. Johns continues to insist that these victims are not victims at all because they were "upside down" on their mortgages and could not have received in the marketplace what Banks offered them. However, as will be demonstrated with City of Milwaukee tax assessment and comparable sales records, the Ten Hoves and Michelle Coleman had every right to the equity that Banks and Johns stole from them.

While the benefit of hindsight clearly shows that the entire marketplace was overvalued during the time-frame of the defendants' fraud scheme, the sales prices of the Ten Hove and Coleman residences were perfectly in-line with that market. Indeed, Banks would later sell both residences at even higher prices. In short, the defendants want to have their cake and eat it too: having taken advantage of a

booming housing market to steal the equity of unsophisticated homeowners, they now want to benefit from the downturn in the market to argue that the homes were not *really* worth that much. As demonstrated below, however, at the time of the offense, the Ten Hove and Coleman sale prices did, in fact, reflect what was occurring in the marketplace.

I.  The Ten Hove $120,000 sale price is supported by the City of Milwaukee Tax Assessment and Comparable Sales Records.

Johns argues that the value of the Ten Hoves's residence was not the "artificially inflated" $120,000 that Banks offered, but instead the $62,000 offer from Johns or the 2004 tax assessment of $90,800. Sentencing Memorandum at pages 8, 10. Doc. No. 88. In truth, Banks's $120,000 offer was in-line with the relevant tax assessment for years 2004-2008 and comparable sales.

First, with respect to the tax assessment, the Ten Hove property was assessed for years 2004-2010 as follows:

**Assessment History Information For 2260924000**

| Year | Land | Imprv | Total |
| --- | --- | --- | --- |
| 2010 | 13900 | 72600 | $86,500 |
| 2009 | 13900 | 77200 | $91,100 |
| **2008** | **13900** | **101600** | **$115,500** |
| **2007** | **13900** | **101600** | **$115,500** |
| **2006** | **7700** | **107800** | **$115,500** |
| **2005** | **7700** | **93600** | **$101,300** |
| 2004 | 7700 | 83100 | $90,800 |

Exhibit 1. [1]

So, in 2005, the year that Banks bought the Ten Hove property for $120,000, the assessed value was $101,300, but in years 2006-2008, the assessed value was $115,000. Moreover, Banks sold the Ten Hove property for $125,000 in October of 2006. Exhibit 2.

Third, comparable sales available from Aldermanic District 2 - Neighborhood # 1490 demonstrate that the $120,000 sale price reflected the market value. Exhibit 3. In 2005, one story, aluminum/vinyl Cape Cods in Neighborhood # 1490 were selling for as little as $86,000 and as much as $130,000, with a majority in the $120,000 range. Exhibit 3, page 2 of 2.

For all these reasons, the $120,000 price that Banks paid for the Ten Hove residence was consistent with the tax assessment for their property in years 2005-2008 and market comparables. The defendants were able to take advantage of the desperate and unsophisticated Ten Hoves who did not understand what was happening in the real estate market. The Ten Hoves, like everyone else in that time-frame were entitled to the upside of the market. [2] Banks and Johns certainly took

---

[1] Municipalities are required to assess within 10% of market value at least once every 4 years. *See* http://city.milwaukee.gov/Marketvalue677.htm

[2] In footnote 5 of his Sentencing Memorandum, Johns seeks to reduce the Ten Hove loss calculation by the amount of money they needed to pay-off their bankruptcy.

-4-

advantage of that market.

II.   The Michelle Coleman $134,000 sale price is supported by the City of Milwaukee Tax Assessment and Comparable Sales Records.

Johns argues that the "story remains the same" for the Michelle Coleman transaction: she possessed "no legitimate equity as of the date she sold her home to Banks." Sentencing Memorandum, page 11. Johns is right; the story is the same. Just like the Ten Hove sale price, the tax assessment and comparable records for the Coleman sale show that the $134,000 price was the true market value. In other words, Coleman did have real equity in her home – and the defendants stole it.

First, with respect to the tax assessment, the Coleman property was assessed for years 2004-2010 as follows:

**Assessment History Information For 3280359000**

| Year | Land | Imprv | Total |
| --- | --- | --- | --- |
| 2010 | 5700 | 79900 | $85,600 |
| 2009 | 5700 | 89400 | $95,100 |
| **2008** | **5700** | **131100** | **$136,800** |
| **2007** | **5700** | **114900** | **$120,600** |
| **2006** | **5700** | **106600** | **$112,300** |
| **2005** | **5700** | **86800** | **$92,500** |
| 2004 | 5700 | 63500 | $69,200 |

---

Johns overlooks the definition of "intended loss" under Application Note in 3.(A)(ii) to U.S.S.B. § 2B1.1. The original settlement statement submitted to the trustee reflected the bogus second mortgage pay-out to Fledderman (and then secretly to Banks) of $27,522.82. Trial Exhibit 8. That is the amount that Banks and Johns sought to steal before the trustee stepped-in, and that is the proper measure of the Ten Hove loss.

-5-

Exhibit 4.

The Coleman-Banks $134,000 sale occurred in the Fall of 2005. Based on the tax assessment records, the sale price, while significantly higher than the 2005 assessment, was in-line with the 2006-2007 assessment, and was less than the 2008 assessment of $136,800. Moreover, in 2007, Banks sold the Coleman residence for $150,000. Exhibit 5.

Looking at comparable sales available from Aldermanic District 15 - Neighborhood # 2520 demonstrate that the $134,000 sale price reflected the market value. Exhibit 6. In 2005, two-story, frame bungalows in Neighborhood # 2520 were selling for as little as $60,000 and as much as $173,000. Exhibit 6, page 2 of 2.

The assessment and comparable sales records demonstrate that the Ten Hoves and Michelle Coleman did have real equity in their homes. There is no evidence that the banks that financed the sales transactions were misled by a fraudulent appraisal. Indeed, the market continued to grow beyond what Banks paid the Ten Hoves and Michelle Coleman. While it may be true, in hindsight, that the entire marketplace was overvalued, it remains the case that the Ten Hoves and Michelle Coleman – at the time they were victimized – did have market-justified equity in their homes.

For these reasons, the loss calculations for the Ten Hove and Michelle Coleman transactions in paragraph 29 of the PSR are correct as written.

III. Banks and Johns were charged with a jointly-undertaken "equity rinsing" scheme and Banks's acts and omissions with respect to the Spellers was reasonably foreseeable to Johns.

Johns's objection to PSR ¶ 29's calculation of the Spellers' equity loss differs from his challenge to the Ten Hove and Coleman losses. He does not dispute that the Spellers' home had equity of $89,724.24 that Banks and Sean Cooper (an unindicted co-actor) pocketed. Sentencing Memorandum, pages 12-16. Instead, Johns argues that, because he had minimal involvement in the Speller transaction and received none of the Speller equity, the Speller loss cannot be attributed to him as relevant conduct under U.S.S.G. § 1B1.3(a).

Because the Speller transaction was charged in count one of the indictment, evidence regarding the same was presented at trial (which Johns did not challenge), and the jury returned a guilty verdict, it's not immediately clear that the issue should be analyzed under U.S.S.B. § 1B1.3(a). Assuming for the sake of argument that Section 1B1.3(a) applies, the evidence at trial strongly supports a finding that Banks's acts and omissions relating to the Spellers were reasonably foreseeable to Johns within the meaning of Section 1B1.3(a)(1)(B).

First, according to Banks's testimony, it was Johns who introduced him to the essence of the scheme: equity rinsing. Second, the relative proximity of the three transactions (Ten Hoves - March 2005; Coleman - September 2005; and Spellers - September 2005) and Johns's central role in two of the three transactions (drafting

the Fledderman mortgage and pressing Michelle Coleman to assign her equity to Fledderman) make it reasonably foreseeable to Johns that Banks would victimize the Spellers. Third, Johns plainly knew that the Spellers were a desperate mark since he tried unsuccessfully to purchase their house. Fourth, that Johns, Banks and Cooper were working in concert is plain because equity proceeds from the Speller sale were deposited into a "Cooper Banks Johns Asset Management Account." Trial Exhibit 35.

Against this evidence, Johns points out that he was not the broker and the post-sale $1,500 check from Banks cannot with certainty be traced to the Speller equity proceeds. This is true enough, but Section 1B1.3(a)(1)(B) does not require either. Rather, Banks's acts and omissions in connection with the Speller transaction must be "reasonably foreseeable" to Johns. With Johns's knowledge of – and central participation in – the Ten Hove and Coleman equity rinsing, it is not difficult to find that Banks's theft of the Speller equity was reasonably foreseeable to Johns.

For these reasons, PSR ¶ 29 is correct as written in calculating as loss, and adding to the Ten Hove and Coleman loss, the Speller equity in the amount of $89,724.24.[3]

---

[3] Johns makes a number of equitable arguments directed towards his relative lack of culpability in the Speller transaction. For example, he argues that it is inequitable

CONCLUSION

Based on the foregoing, the United States respectfully requests that the Court adopt the loss calculations set forth in Paragraph 29 of the Presentence Investigation Report.

Respectfully submitted this 24th day of August 2011.

                                    JAMES L. SANTELLE
                                    United States Attorney

By:

                                    s/Gordon P. Giampietro
                                    Assistant United States Attorney
                                    D.C. Bar Number: 446600
                                    Office of the United States Attorney
                                    Eastern District of Wisconsin
                                    517 East Wisconsin Avenue, Room 530
                                    Milwaukee, Wisconsin  53202
                                    Telephone: (414) 297-1083
                                    Fax: (414) 297-1738
                                    E-Mail: gordon.giampietro@usdoj.gov

---

that he, but not Banks and Cooper, should be left "holding the proverbial bag" for the lost Speller equity. The arguments, while unavailing for purposes of his challenge to the loss amount in PSR ¶ 29, may have some merit for purposes of the Court's "reasonable sentence" analysis under 18 U.S.C. § 3553(a) and perhaps also the award of restitution under 18 U.S.C. § 3664(h).